SAN ANGELO LIFE & ACCIDENT ASS'N
v. HAYNES et al.

No. 8465.

Court of Civil Appeals of Texas. Austin.

May 26, 1937.

Rehearing Denied June 16, 1937.

364

BAUGH, Justice.

Appellant is a mutual aid assessment association. On March 4, 1934, it issued to Harvey E. Haynes a benefit certificate in which appellee, his mother, was named beneficiary. Harvey E. Haynes died of tuberculosis on December 4, 1934, and the association denied liability on the ground that the insured had made false statements in his application, that he was not in good health as he represented himself to be both in the application and in his written acceptance of the certificate, and that under its express terms the policy, or certificate, was void. Appellee thereupon filed suit on the policy, in effect admitting these facts, but sought to bind the association on the grounds of waiver and estoppel, in that the agent of the association, who filled out the application, was informed at the time that insured had tuberculosis; that he wrote false answers into the application; that the agent of the insured who made the application for him did not read the application before she signed insured's name thereto; that the knowledge of insured's tubercular condition imparted to its agent was imputed to the association; and that it is therefore estopped to deny liability on the policy. Trial was to a jury, but at the close of the evidence the court instructed a verdict in favor of Mrs. Haynes and judgment was rendered accordingly; hence this appeal.

The application, dated March 20, 1934, was made at San Angelo to the local agent of appellant association. Harvey E. Haynes and his mother were then in New Mexico, and, so far as the record shows, they remained there until the insured died. The insured's aunt, who held a certificate in said association, made the application and signed Harvey E. Haynes' name thereto without his knowledge or consent. The policy was thereupon issued and mailed to the insured. There is nothing in the record to show that the insured ever saw the application either before or after the policy was issued, or that he knew its contents. It must be presumed, however, that the insured ratified the acts of his aunt in making the application and made her his agent in that regard. Otherwise he never had any contract with the association. Texas Mut. Life Ins. Ass'n v. Henderson (Tex.Civ. App.) 33 S.W.(2d) 869; American Nat. Ins. Co. v. Brawner (Tex.Civ.App.) 93 S. W.(2d) 450, 451. And her action in the matter, and the information imparted to or

Upton & Upton and Travis E. Baker, all of San Angelo, for appellant.

L. J. Curtsinger and D. I. Durham, both of San Angelo, for appellees.

obtained by her in the premises would be as binding on him as the acts and information of the association's agent would be upon it.

The facts and circumstances surrounding the making of the application, according to the testimony of insured's aunt, and of her daughter who also testified, were as follows: The aunt who signed insured's name to the application was a policyholder in appellant association. On one occasion when the agent came to her home to collect dues from her she asked him if Harvey Haynes could procure a policy, at which time she informed the agent that the insured had tuberculosis. She thereafter discussed the matter with Harvey's father, who advised her that because his son had tuberculosis he was not eligible for insurance. We quote from her testimony as to what transpired in this connection:

"Q. Was anything said about his health? A. I said, 'Mr. Grief, this boy has tuberculosis' and he said, 'Don't tell me anything about the boy's health.'

"Q. Did you make the application at that time? A. No, sir.

"Q. When was the next time you saw him? A. It was something like a week later.

"Q. Was the same matter discussed at that time? A. Yes, I told him that I had talked to Mr. Haynes, the boy's father, about it and told him that he didn't think the boy was eligible for the insurance.

"Q. What did you tell him about the boy, if anything?

"Mr. Upton: We object to that because the writing is the best evidence.

"The Court: You may have your bill.

"Witness: I said, 'This boy has tuberculosis' and he said, 'Don't tell me anything.' He repeated that the second time.

"Q. Did you tell him what the boy's father said? A. Yes, I told him the boy's father didn't think he could get the insurance.

"Q. Why did his father think he could not get it? A. Because he didn't think the Company would take him on account of him not being well.

"Q. What did he say was the matter with him? A. He said he had tuberculosis.

"Q. You informed Mr. Grief on both occasions? A. Yes, sir.

"Q. Did you sign the application at that time? A. Yes, sir.

"Q. Did Mr. Grief ask you some questions about the boy? A. Yes, sir.

"Q. What did he ask you about the boy? A. He asked a few questions about his age and probably his height, his occupation and where he was at that time.

"Q. Was anything further said by Mr. Grief after you told him the boy had tuberculosis; in other words, have you related all the conversation there—was anything said about his ability to drive a car? A. Yes, he said: 'How is the boy, is he bedfast?' I said, 'No, he drove a car to New Mexico this last week,' and he said, 'He would be considered a well man if he could drive a car and would be eligible for insurance.'

"Q. Did you make application at that time? A. Yes, sir.

"Q. Would you recognize that application if you saw it? A. I think so. (Handing witness application.)

"Q. Did you sign Harvey E. Haynes' name to it? A. I did.

"Q. Did you read the application at that time? A. No, sir, not a word of it.

"Q. Harvey E. Haynes was not present? A. No, sir."

As to what transpired on these occasions, the daughter of Mrs. Bailey testified:

"Q. How long was it before he came back after the first visit? A. It was about a week.

"Q. Did they have any conversation about the matter in your presence when he came back? A. Yes, I was there a very few minutes the last time.

"Q. What did Mrs. Bailey say to him and he to her? A. She told him she had talked to Mr. Haynes and that he (Mr. Haynes) told her it was out of the question; that 'you can't get insurance on that boy because he is not eligible.' Mother said, 'I think I can from what the agent told me.'

"Q. Tell us what she said to Mr. Grief? A. She told him that Mr. Haynes told her not to take the insurance at all. Mother had told Mr. Grief that the boy had tuberculosis, and Mr. Haynes said, 'You be sure and tell him.'

"Q. What happened next? A. Mr. Grief said: 'Now, Mrs. Bailey, that is all right; don't tell me anything. It is the Company's business to investigate about his health.'

"Q. What did he do next? A. He made out the application.

"Q. Did you see the application? A. Just in his hands.

"Q. You didn't read the application? A. No, sir.

"Q. You understood what he was doing? A. Yes, sir.

"Q. Did he ask your mother any questions about this boy? A. He asked about his description, height and weight.

"Q. Who wrote down the answers? A. Mr. Grief did the writing.

"Q. Were you present when the application was signed? A. Yes, sir.

"Q. Do you remember seeing her read it? A. I am positive she did not read it over."

On cross-examination she also testified:

"Q. Tell us exactly what he said? A. I don't know the exact words but he said, 'You don't need to tell me that, don't tell me anything; it is the Company's business to find out about it.'

"Q. They 'agreed then they would answer these questions and let the Company find out about it? A. There was no agreement made.

"Q. That was the conversation between your mother and Mr. Grief, that this boy had tuberculosis and we will leave it up to the Company and let the Company find.it out? A. He said if there was any doubt about it the Company would investigate it.

"Q. That is what they were doing, and he telling her not to tell the Company about the boy, but let the Company find it out if they could? A. I would not say; they were figuring out a way to get the insurance."

The application as signed contained representations that the applicant did not have tuberculosis and that he was in good health at the time. The application, on which the policy was issued and of which it was made a part, bore the indorsement signed by the agent as follows:

"I have known the applicant for —— and have investigated the applicant's mode of living, occupation and habits and believe him to be in good health and a desirable risk for life insurance in this Association."

The policy, or certificate, itself, which was required to be signed by the insured, immediately above his signature contained the following:

"16. I have read this policy and understand and accept same, subject to the conditions and provisions contained herein.

"17. I also warrant and declare that all answers and statements given in my application for this Policy of Insurance are true and correct and are given as warranties and that on the date this policy was received by me, that I was in good health and in an insurable condition.

"H. E. Haynes."

It is now well settled that the provisions of an application and of a policy to the effect that if false representations material to the risk are made in such application; or if insured is not in good health at the time the policy is delivered it shall be void, are valid enforceable provisions. Southern Surety Co. v. Benton (Tex.Com. App.) 280 S.W. 551; and cases there cited; 24 Tex.Jur. p. 691, § 21. It is equally well settled that where in this character of policy an applicant in good faith gives correct information as to his health to the agent, and the agent without his knowledge or consent writes into the application false information, when the truth was made known to him, the insurer will be estopped to assert the invalidity of such policy based thereon. See American Nat. Ins. Co. v. Park (Tex. Civ.App.) 55 S.W.(2d) 1088 (writ refused) and cases there cited. This latter is the rule relied upon by appellee to sustain the trial court's judgment. This rule, however, presupposes good faith and want of negligence on the part of the applicant.

In the instant case, inasmuch as Harvey Haynes did not know what his aunt had told the agent of the association in connection with his application, and after he had received the certificate, had accepted it by signing his name thereto and thereby falsely certified that he was in good health at the time it was delivered to him, it may be seriously doubted whether his beneficiary, because of his own affirmative acts, is entitled to urge estoppel against the association to avoid the policy. But if it be conceded that regardless of this, that notice of his tubercular condition was given to the agent of the association, under the facts and circumstances shown, we have concluded that the association is not estopped to assert the invalidity of the policy.

From the testimony above quoted, we think the conclusion is inescapable that Mrs. Bailey knew at the time she signed Harvey Haynes' name to the application that because of his tubercular condition he could not obtain such insurance, if the true facts were made known to the association.

And the further conclusion, we think, is also inescapable from what she and her daughter testified that the agent said, that the agent did not intend to place such information in the application. This testimony strongly implies a tacit collusion between the agent of the association on the one hand and the agent of the insured on the other to deceive the association as to the true state of health of Harvey Haynes and thereby procure said policy. If that were true, then the information given to the agent would not be imputed to the association. The law in this regard is well stated in 2 Am.Jur. § 379, p. 298, as follows:

"There is a well-established exception to the general rule that the knowledge of an agent is to be imputed to the principal in situations where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, as where the agent acting nominally as such is in reality acting in his own business or for his own personal interest and adversely to the principal, or for any other reason has a motive or interest in concealing the facts from his principal. * * * Such is also the case where the third persons, or their representatives, who claim the benefit of the imputation of the agent's knowledge to the principal, collude with the agent to cheat or defraud the principal."

See, also, Mutual Life Ins. Co. of N. Y. v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202; Zeidel v. Connecticut Gen. Life Ins. Co. (D.C.) 44 F.(2d) 843; Standard Sav. & Loan Ass'n v. Fitts, 120 Tex. 303, 39 S.W.(2d) 25; 24 Tex.Jur. § 180, p. 927.

In addition to the above grounds, in view of knowledge of Mrs. Bailey that Harvey Haynes was not insurable, and the statements made to her by the agent, she at least had every reason to believe that he would not place in the application the information that Harvey Haynes had tuberculosis. And if it be conceded, as urged by appellee, that there was no collusion shown between the agent of the applicant and the agent of the association to fraudulently obtain the policy, in view of the knowledge of Mrs. Bailey that Harvey Haynes was not insurable, and her testimony as to what the agent of the association had told her and the implication and inference in such statements that such policy could be obtained only by deceiving or misleading the officers of the association as to his health, we think any reasonable degree of prudence would have required her to read the application or otherwise learn its contents before she signed it. And her failure to do so under her own testimony and that of her daughter, if it did not amount to acquiescing in the fraud of the agent against his principal, was certainly such palpable negligence as to negative good faith. If she had read the application before she signed it, as under the circumstances she clearly should have done, the false statements would readily have been disclosed. Not only was this true, but the application provided: "I hereby declare and warrant that *the answers set out above* are complete and true and shall form the basis of a contract between me and the San Angelo Life & Accident Ass'n," etc. (Italics ours.) And immediately above the applicant's signature appeared the following: "Read this: I hereby certify that the above answers are true at this time, and if found to be untrue, * * *" the association was authorized to cancel the policy. Under these circumstances, the applicant did not merely warrant that the answers given to the agent were true, regardless of what he wrote into the application, but that the answers as "set out above" were true. That is, that the answers as recorded in the application were true. In such cases, the decisions hold that it is the duty of the applicant to see to it that true answers are properly recorded in the application and his failure to read it before signing in such case constitutes such negligence on his part as to bar the right of recovery by his beneficiary. This was the express holding of this court in Sovereign Camp, W. O. W. v. Lillard (Tex.Civ.App.) 174 S.W. 619, 622 (writ refused); and to the same effect are the following authorities: Hemphill County Home Protective Ass'n v. Richardson (Tex.Civ.App.) 264 S.W. 294 (writ refused); Rockford Life Ins. Co. v. Tschiedel (Tex.Civ.App.) 61 S.W.(2d) 536, 538; Sovereign Camp, W. O. W. v. Newberry (Tex.Civ.App.) 87 S.W. (2d) 839; 24 Tex.Jur. § 176, p. 922.

We conclude, therefore, that under the facts and circumstances shown by appellee the association was entitled to an instructed verdict in its favor. The judgment of the trial court is therefore reversed and judgment here rendered in favor of appellant.

Reversed and rendered.